# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Tammy Wilson,**
**Petitioner Below, Petitioner**

**vs.) No. 20-0493** (Mason County 15-C-139)

**J.D. Sallaz, Superintendent, Lakin**
**Correctional Center, and the West Virginia**
**Parole Board,**
**Respondents Below, Respondents**

# MEMORANDUM DECISION

Petitioner Tammy Wilson, by counsel Timothy P. Rosinsky, appeals the Circuit Court of Mason County's February 28, 2020, order denying her petition for a writ of habeas corpus alleging that Respondent The West Virginia Parole Board (the "Parole Board" or the "Board") denied her parole in an arbitrary and capricious matter. Respondents J.D. Sallaz, Superintendent, Lakin Correctional Center, and the Parole Board, by counsel Patrick Morrisey and Keith D. Fisher, filed a response and supplemental appendix.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner, who was in a romantic relationship with and employed by Tod McQuaid, believed that, should Mr. McQuaid die, she would acquire his business. Accordingly, she solicited the help of Roger Cline and Harry Johnson to murder Mr. McQuaid, promising positions and/or promotions within the company in exchange for their assistance. On the night of Mr. McQuaid's murder, petitioner and Mr. McQuaid consumed alcohol at a bar, and petitioner gave Mr. McQuaid Valium. The two later returned to petitioner's home, and Mr. McQuaid passed out on the floor. Petitioner then summoned Mr. Cline and Mr. Johnson, who were waiting down the road, to her home. Mr. Cline shot Mr. McQuaid in the back of his head. Petitioner and her accomplices wrapped Mr. McQuaid's body and placed it in the back of one of his company vehicles, and Mr. Cline drove the body to Ohio and disposed of it. Petitioner and her accomplices also tore out and burned the bloodstained portions of the carpet on which Mr. McQuaid was murdered, and Mr. Johnson purchased new carpet to replace the old.

1

During the investigation into Mr. McQuaid's disappearance, petitioner lied to officers regarding his whereabouts, claiming that he had traveled out of town to visit a former girlfriend but that he had phoned the office daily. Later, she told police that Mr. McQuaid called the office to report having been "shot on the mountain behind Meadow Bridge." Ultimately, the police realized that petitioner was not being truthful, were led to petitioner's accomplices, and obtained statements from her accomplices admitting to their and petitioner's roles in Mr. McQuaid's murder.

Mr. Johnson pled guilty to second-degree murder, and Mr. Cline was found guilty of first-degree murder, with a recommendation of mercy. Petitioner was likewise convicted of first-degree murder, but the jury did not recommend mercy. Petitioner filed a direct appeal, which was refused by this Court in 1992, and she unsuccessfully sought a writ of certiorari from the United States Supreme Court. *See Wilson v. Spitz*, 514 U.S. 1027 (1995).

Later, petitioner filed a petition for a writ of habeas corpus, and the habeas court concluded that "the relief requested by the writ of habeas corpus would be granted on the ground that the jury was improperly constituted as alleged in the petition." After petitioner was granted habeas relief, the parties entered into a plea agreement under which petitioner pled guilty to first-degree murder, with the possibility of parole.[1]

Petitioner, now eligible for parole, appeared before the Parole Board in 2004. She was denied parole, and she was again denied parole in 2007. Petitioner does not challenge these denials.

Petitioner next appeared before the Parole Board in 2010. In considering her for parole, the Board noted that the facts and circumstances of her crime were "extremely negative." The community/public sentiment was listed as "negative," and the official sentiment was "extremely negative." The Board also viewed her five writeups during her incarceration as "negative." But petitioner was rated favorably on her "record of participation in education, vocational, and therapeutic programs recommended to [her] by the prison staff," and the Board also viewed favorably the fact that she had had no writeups in the three years preceding her hearing.

In her interview with the Parole Board in 2010, petitioner denied conspiring with Mr. Cline and Mr. Johnson. She claimed that Mr. Cline came to her house on the night of Mr. McQuaid's murder uninvited and that Mr. Cline shot Mr. McQuaid to "protect" her from him.

After considering "all the factors disclosed in your record, various official reports including court documents and the results of your personal interview," the Board denied petitioner parole, finding that she was "not prepared to reintegrate back into society." The factors the Board rated as

---

[1] Petitioner's guilty plea was entered under *North Carolina v. Alford*, 400 U.S. 25 (1970). In *Kennedy v. Frazier*, relying on *Alford*, this Court held that "[a]n accused may voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even though he is unwilling to admit participation in the crime, if he intelligently concludes that his interests require a guilty plea and the record supports the conclusion that a jury could convict him." 178 W. Va. 10, 357 S.E.2d 43, Syl. Pt. 1 (1987).

"negative" or "extremely negative" were found to outweigh the other factors. The Parole Board further found that petitioner's "interview failed to convince the Board [her] release on parole would be compatible with—or in the best interests of—society in general." The Board noted additionally that her "crime was an egregious act of violence that warrants justification for extended parole consideration," and it opined that petitioner's "release at this time would diminish the severity of the seriousness of this crime." The Board scheduled her next review hearing for 2013 and recommended that petitioner stay write-up free, complete recommended programs, and obtain/maintain employment.

At petitioner's parole hearing in 2013, the facts and circumstances of her crime were again rated "extremely negative." Her writeups, only one of which occurred during the three years preceding the hearing, were rated "neutral." Community/public sentiment was rated "negative," while official sentiment was rated "neutral."

During petitioner's interview before the Board, she maintained that Mr. Cline killed Mr. McQuaid to protect her. One panel member remarked, "I've read the file and the more I listen to you the more confused I get. What is your part in this murder? You tell me. Don't say you can't remember. What is your part in this murder?" Petitioner claimed that she could not remember if she directed Mr. Cline to kill Mr. McQuaid.

One of the victim's daughters also spoke at petitioner's parole hearing, detailing the effects of her father's murder on her and her family.

The Parole Board, after considering "all the factors disclosed in [petitioner's] record, considering the positive as well as the negative factors and various official reports including court documents and the results of [her] personal interview," concluded that petitioner's "continued incarceration will serve to protect society from possible future violence," so it denied petitioner parole. In addition, the Board was "not . . . convinced through [petitioner's] personal interview that [she] no longer pose[d] a threat to society." The Board scheduled petitioner's next review for 2015.

At petitioner's next review, in 2015, she was also denied parole. The Board again viewed unfavorably the "high offense severity" insofar as it was a "[w]illful act of violence [that] resulted in death of victim with a pattern of violent behavior reflecting continuing risk to public." The Board determined that "continued incarceration will serve to protect the public from possible future violence," and "[a]n additional period of incarceration will further [her] rehabilitation and will not be detrimental to the interests of the parties involved in [her] crime." These determinations were made following the Board's careful consideration

> of all the factors disclosed in [her] records, . . . the positive and negative factors related to [her] risk of reoffending, [her] progress in the DOC, [her] re-entry planning efforts, and the various official reports from the DOC, treatment providers, the court documents, as well as input from the community, victims, family and officials.

The Board also considered petitioner's "risk and needs, and [her] interview during the parole hearing." During that interview, petitioner reiterated that Mr. Cline killed Mr. McQuaid to

protect her because Mr. Cline saw Mr. McQuaid "do things he didn't like." She further claimed that there was "a lot of stuff" she did not remember. The Board found that petitioner's "interview failed to demonstrate that [her] rehabilitation is complete and [she] no longer pose[d] a threat to society." Additionally, Mr. McQuaid's daughter and ex-wife spoke at the hearing and opposed petitioner's release on parole. Petitioner's next review was scheduled for 2017.

In 2017, the Board noted the "high offense severity" and petitioner's "high risk and needs assessment indicating [her] current risk to the community" in denying her parole. It documented that there was a lack of community support for release, that petitioner failed to accept responsibility for the offense, negative official input, and that, once more, her "interview failed to demonstrate that [her] rehabilitation [was] complete and [she] no longer pose[d] a threat to society." During petitioner's interview, she claimed to "take responsibility for myself that night," but she later stated that she believed Mr. Cline shot Mr. McQuaid because Mr. Cline "was protecting [her] . . . [from] [t]hings he had seen in the past." The Board reached its conclusions after it "carefully considered all the factors disclosed in [petitioner's] record, considering the positive as well as the negative factors and various official reports including court documents and the results of [her] personal interview."

Petitioner then filed the underlying petition for a writ of habeas corpus asserting that the Parole Board acted in an arbitrary and capricious matter in denying her parole in 2010, 2013, and 2015, and that it failed to provide an explanation of the weight it attributed to "the numerous positive factors presented in my favor versus negative factors that are beyond my power to change."[2] Petitioner argued that her codefendants have been released from incarceration, and she sought "the second chance given to those around me. I ask only the same consideration that others [sic] male and female inmates have been afforded in these same circumstances." Petitioner highlighted that she has been allowed "out in the [c]ommunity dressed in 'street' clothes," which she argued demonstrated that she posed no danger to the community. Additionally, petitioner highlighted that she was named a "representative for Arts and Crafts Program at the Buckwheat Festival and Pilot Puppy Program" and that she has served in "secure and sensitive departments at the institutions and received excellent work evaluation[s]."

Following the filing of respondents' respective responses to petitioner's habeas petition, petitioner filed an amended petition. Petitioner recounted that her initial petition asserted that the Parole Board abused its discretion and acted arbitrarily and capriciously in denying her parole in 2010, 2013, and 2015, and stated that "[t]he ONLY addition to this pleading is an identical legal and factual claim based upon the Parole Board's denial of [p]etitioner's parole following a Parole Board hearing in 2017."

The parties appeared for an evidentiary hearing held over two days in October and December of 2018. Petitioner testified that, as of the date of her hearing, she had been incarcerated for twenty-eight years, that codefendant Mr. Cline was released from incarceration in 2009 or

---

[2] Petitioner raised two other grounds for relief, but she does not argue on appeal that the habeas court erred in denying relief on those grounds. Accordingly, they are not addressed here. Also, as addressed below, petitioner raised a challenge to the Parole Board's 2017 denial in an amended petition.

4

2010, and that codefendant Mr. Johnson was released in 1999. Petitioner's only criminal charge was the charge giving rise to her underlying conviction; however, petitioner had been told that her codefendants' criminal records included convictions aside from those related to Mr. McQuaid's murder. Petitioner testified that she had completed all rehabilitation programs for which she was eligible, that she had completed all recommendations made by the Parole Board following her various hearings, and that she had "tried to express" her remorse to the Parole Board. Petitioner explained, "I don't do a well [sic] parole hearing because I'm not going to say anything ill, I'm not make going to make any excuses. There is no excuse. I'm not going to say they were more to blame than me." Petitioner further offered that she has behaved in prison, has received community support, has undergone counseling, and has been employed for the duration of her incarceration. A psychological evaluation deemed her a low risk of reoffending. Petitioner testified that the Parole Board has not informed her of anything more she could do.

Lori Loomis-Wedge, who is employed by the West Virginia Board of Education at Lakin Correctional Center, testified on petitioner's behalf regarding her individual re-entry plan. Ms. Loomis-Wedge testified that petitioner "has done everything that we, as the Department of Education, ha[ve] to offer." Ms. Loomis-Wedge further testified that outside entities, such as West Virginia Agriculture and various state universities, have offered classes, all of which petitioner completed. In short, "[s]he's done everything we have, and done well. She's been on the Dean's list every time."

Ava Roush, the mental health director at Lakin Correctional Center and petitioner's therapist, testified that petitioner "completes all therapy work as assigned [and] has a history of good coping skills." Ms. Roush stated that she "only see[s] [petitioner] when really when she needs to process." Ms. Roush testified that petitioner "has completed all treatment with mental health, and there is nothing, you know—other than, you know, processing every now and again, that's all she needs."

The court denied petitioner habeas relief by order entered on February 28, 2020, finding that petitioner had failed to show that the Board acted arbitrarily and capriciously in denying her parole. The court observed that petitioner appeared before the Board in 2004, 2007, 2010, 2013, 2015, and 2017, and at each hearing, she failed to take responsibility for murdering Mr. McQuaid. The court further observed that there was no evidence that the Parole Board failed to consider petitioner's educational and other accomplishments or that the Board did not consider the required positive and negative factors. It is from this order that petitioner now appeals.

Our standard of review of an order denying habeas relief is well settled:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review. Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *Anstey v. Ballard*, 237 W. Va. 411, 787 S.E.2d 864 (2016).

5

On appeal, petitioner assigns error to the court's denial of her habeas petition, arguing that the Board abused its discretion in denying her parole. She highlights that she met the technical requirements for parole eligibility in that she served the minimum term of her indeterminate sentence, was not in punitive segregation or administrative segregation, had prepared a Division-of-Corrections-and-Rehabilitation-approved written parole release plan, and had successfully completed all rehabilitative and educational programs. *See* W. Va. Code § 62-12-13. With regard to her failure to satisfy the Parole Board that she would not constitute a danger to the community, petitioner argues that her involvement in community programs shows that she is not a danger to the community, and she points to letters of recommendation in her parole file reflecting "the gratitude of some very influential people" for her service and leadership in these programs. Although petitioner recognizes that the Board found that she exhibited a "lack . . . of responsibility and accountability," she maintains that she has accepted responsibility for her role in the slaying but that she is "not comfortable saying certain things about the victim 'out of respect' for the victim's children." She believes her only "obstacle" to be her "poor interview skills." Petitioner also contends that arbitrariness and capriciousness can be inferred in the Board's denial because her codefendants, including the one who actually shot and killed Mr. McQuaid, were paroled years ago.

West Virginia Code § 62-12-13 sets forth the eligibility requirements for parole as well as the factors to be considered by the Parole Board in ultimately determining whether to release an inmate on parole. Generally, the statute provides "that if the best interests of the State and the prisoner so indicate, the parole board may release a prisoner upon parole." *Rowe v. Whyte*, 167 W. Va. 668, 670-71, 280 S.E.2d 301, 303 (1981). Our review of the Parole Board's parole decision is for an abuse of discretion: "The decision to grant or deny parole is a discretionary evaluation by the board based on a prisoner's record and its expertise. We shall only review such decision to see if the board abused its discretion by acting in an arbitrary and capricious fashion." *Tasker v. Mohn*, 165 W. Va. 55, 67, 267 S.E.2d 183, 190 (1980).

Under West Virginia Code § 62-12-13,

[w]hen considering an inmate of a state correctional facility for release on parole, the Parole Board panel considering the parole shall have before it an authentic copy of, or report on, the inmate's current criminal record as provided through the West Virginia State Police, the United States Department of Justice, or any other reliable criminal information sources and written reports of the superintendent of the state correctional institution to which the inmate is sentenced:

(A) On the inmate's conduct record while in custody, including a detailed statement showing any and all infractions of disciplinary rules by the inmate and the nature and extent of discipline administered for the infractions;

(B) On the inmate's industrial record while in custody which shall include: The nature of his or her work, occupation or education, the average number of hours per day he or she has been employed or in class while in custody and a recommendation as to the nature and kinds of employment which he or she is

6

best fitted to perform and in which the inmate is most likely to succeed when he or she leaves the state correctional institution; and

(C) On any physical, mental, psychological, or psychiatric examinations of the inmate.[3]

*Id.* § 62-12-13(l). West Virginia Code of State Rules § 92-1-6 also sets forth many factors the panel is directed to consider in determining whether to grant parole, including, but not limited to, "offense severity, risk assessment, program participation/completion and misconduct history"; "[w]hether the inmate has satisfactorily participated in institutional education, work, therapeutic or treatment programs"; "[t]he sentiment expressed by Members of the community, victims of the crime committed by the inmate and criminal justice officials in the area where the crime occurred"; "[t]he facts and circumstances of the crime"; and "the risk assessment performed upon the inmate." W. Va. Code R. § 92-1-6.1. Importantly, the panel is directed to consider "[t]he demeanor of the inmate during the interview and the attitudes expressed with regard to prior criminal behavior, to social morals and law" and "[a]ny other factor which may tend to indicate whether or not the inmate constitutes a reasonable risk to safety or property if released on parole." *Id.*

As thoroughly detailed above, the Parole Board considered the required factors and determined, during each review petitioner challenges, that her release upon parole would not be compatible with the best interests and welfare of society. Indeed, petitioner does not contend that the Board failed to consider any required factor; rather, she merely emphasizes the positive factors in her record while downplaying the negative. Petitioner's displeasure with the Board's decisions alone—which decisions were reached following in-depth reviews and careful consideration of the required information—fails to demonstrate that the Board abused its discretion in denying her parole.

Petitioner further attempts to demonstrate that the Parole Board acted arbitrarily and capriciously by distinguishing the circumstances present in her case with those presented in other cases in which this Court affirmed the denial of parole. Petitioner distinguishes one such case, *State ex rel. Stollings v. Haines*, 212 W. Va. 45, 569 S.E.2d 121 (2002), by noting that "the inmate [in *Stollings*] refused to acknowledge that he held a gun to the victim's head and pulled the trigger, which was the essential nature of the crime; again, not present in this case." Contrary to petitioner's assertions, however, the circumstances of *Stollings* are similar to petitioner's circumstances. We noted in *Stollings* that

the Parole Board expressed considerable dismay that Mr. Stollings still contended that he did not remember placing the pistol to Ms. Sizemore's head and killing her. During the hearing, Mr. Stollings, while claiming to accept responsibility for the crime, could recall only matters that occurred prior to the shooting and afterward.

*Id.* at 48, 569 S.E.2d at 124. As in *Stollings*, the panel considering petitioner's parole in 2013 was confused by the claims she made in her interview and directed her not to say that she could not

---

[3] West Virginia Code § 62-12-13 was amended a number of times over the years petitioner appeared before the Parole Board. The cited provision was not amended in a way that materially affects this Court's analysis; accordingly, the current version is quoted.

remember what happened, yet petitioner maintained that she could not remember if she directed Mr. Cline to kill Mr. McQuaid. In 2015, petitioner repeated that there was "a lot" she could not remember, and in 2017, despite claiming to "take responsibility for [her]self," she again conveyed her belief that Mr. Cline murdered Mr. McQuaid because he was protecting her. On appeal, petitioner acknowledges that she was not forthright with the Board and characterizes the parole interviews as an "obstacle." We concluded in *Stollings* that the Parole Board did not abuse its discretion in denying parole because it conducted a thorough interview of the incarcerated individual and addressed all of the required statutory issues. *Id.* We also observed that the Parole Board set forth the reasons for its decision, including its "dismay" that the inmate in *Stollings* maintained an inability to recall pertinent facts of his involvement in the crime for which he was incarcerated. *Id.* These same facts lead us to find that the Board did not abuse its discretion in denying petitioner parole in the instant case. Here, the Board meticulously considered and addressed the necessary statutory factors and conducted interviews of petitioner, during which it made judgments of petitioner's credibility that this Court will not disturb. *See State v. Guthrie*, 194 W. Va. 657, 669 n.9, 461 S.E.2d 163, 175 n.9 (1995) ("An appellate court may not decide the credibility of witnesses . . . ."). In our review of the record, the Board's finding in each of the challenged years that petitioner's release upon parole would not be in her or society's best interests is fully supported.

We also decline to "infer" that the Parole Board acted arbitrarily and capriciously in denying her parole because her codefendants have been paroled. First, petitioner has failed to substantiate her assertions regarding her codefendants. They did not testify at the omnibus hearing nor has petitioner produced any documentation regarding their alleged parole. More important, the factors considered by the Parole Board in determining whether to grant parole are specific to the individual before the panel.[4] *See* W. Va. Code R. § 92-1-6.1. Accordingly, whatever decisions the Board allegedly reached with respect to petitioner's codefendants does not demonstrate that petitioner is entitled to habeas relief with regard to her parole denials.

Petitioner also assigns as error the Parole Board's scheduling of her parole review hearings in two- and three-year intervals. In Syllabus Point 3 of *State ex rel. Carper v. West Virginia Parole Board*, 203 W. Va. 583, 509 S.E.2d 864 (1998), we held that

> [t]o pass constitutional muster under the *ex post facto* clause of the *West Virginia Constitution*, Article III, Section 4, the provisions of *W.Va.Code*, 62-12-13(a)(5) [1997] allowing up to 3 years between parole reviews for prisoners serving terms of life imprisonment with the possibility of parole must be applied on a case-by-case basis to prisoners whose offenses occurred at a time when the law prescribed annual parole reviews. The Board of Parole may only extend the period between parole review hearings for such prisoners beyond 1 year if the Board has made a case-specific individualized determination with reasoned findings on the record showing why there will be no detriment or disadvantage to the prisoner from such

---

[4] Petitioner claims that her codefendants' alleged parole "at least raises an Equal Protection argument." She does not brief any equal protection claim, however, so we decline to address one. "Although we liberally construe briefs in determining issues presented for review, issues . . . mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996).

an extension. Additionally, due process requires that such a prisoner receiving a review period of more than 1 year must be afforded the opportunity to submit information for the Board's consideration during any extended period requesting that a review be granted before the expiration of the extended period.

Petitioner argues that the Board failed to make an individualized determination justifying a departure from annual reviews, but she failed to "articulate [this issue] with such sufficient distinctiveness to alert [the] circuit court to the nature of the claimed defect," so she has failed to preserve the issue for appellate review. Syl. Pt. 2, in part, *State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 470 S.E.2d 162 (1996). While petitioner mentioned in passing that the Board scheduled her review hearings for, variably, two or three years, she did not assert error in the Board's extension of the period between her parole review hearings. "This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syl. Pt. 2, *State ex rel. Lewis v. Hall*, 241 W. Va. 355, 825 S.E.2d 115 (2019) (citations omitted). Accordingly, we decline to address this claimed error.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** February 25, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Alan D. Moats sitting by temporary assignment

**DISQUALIFIED:**

Justice William R. Wooton